John **DOE I, John Doe II, and John Doe III, on their own behalf and as representatives of the class of sex offenders in the State of Iowa, Plaintiffs**

v.

Tom **MILLER, Iowa Attorney General and J. Patrick White, Johnson County Attorney as representative of the class of all county attorneys in Iowa, Defendants.**

No. 3:03–CV–90067.

United States District Court, S.D. Iowa, Davenport Division.

Feb. 9, 2004.

Philip B. Mears, Esq., Iowa City, IA, Randall C. Wilson, Des Moines, IA, for Plaintiffs.

J Patrick White, Esq., Iowa City, IA, Gordon E. Allen, Des Moines, IA, for Defendants.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Writing in dissent from an en banc panel of the Eighth Circuit Court of Appeals more than thirty years ago, former Chief Circuit Judge Donald Lay observed:

> The denial of due process in parole revocation simply mirrors society's overall attitude of degradation and defilement of a convicted felon. It is sad 20th Century Commentary that society views the convicted felon as a social outcast. He has done wrong, so we rationalize and condone punishment in various forms. We express a desire for rehabilitation of the individual, while simultaneously we do everything to prevent it. Society cares little for the conditions which a prisoner must suffer while in prison; it cares even less for his future when he is released from prison. He is a marked man. We tell him to return to the norm of behavior, yet we brand him as virtually unemployable; he is required to live with his normal activities severely restricted and we react with sickened wonder and disgust when he returns to a life of crime.

*Morrissey v. Brewer*, 443 F.2d 942, 953 (8th Cir.1971) (en banc) (Lay, J., dissenting), *rev'd*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

Societal attitudes towards convicted persons have changed little in the three decades since *Morrissey*. A convict who has served his or her sentence still faces the social stigmas and discrimination that Judge Lay described. Yet, in some instances, the crimes perpetrated by certain classes of offenders are so offensive to human dignity and so atrocious that many would be comfortable using any means necessary to prevent even the possibility of re-offense. The present case asks the Court to examine the limits of this supposi-

tion as the class of Plaintiffs represented includes those who society would deem among the most deplorable of offenders, those convicted of committing sexual offenses against minors. To what extent, then, may the State go to protect its children from those whom it suspects might prey upon them?

"Sex offenders are a serious threat in this Nation." *Connecticut v. Doe*, 538 U.S. 1, 4, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003) (quoting *McKune v. Lile*, 536 U.S. 24, 32, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (plurality opinion)). "The victims of sex assault are most often juveniles," and "when convicted sex offenders reenter society, they are much more likely than any other type of offender to be re-arrested for a new rape or sex assault." *Id.* (quoting *McKune*, 536 U.S. at 32–33, 122 S.Ct. 2017).

In 2002, the State of Iowa responded to this threat by enacting Iowa Code § 692A.2A. The Act prohibits a person who has committed a criminal offense against a minor from residing within two thousand feet of a school or child care facility. Three named Plaintiffs initially brought this action against the Iowa Attorney General and a proposed defendant class consisting of all of Iowa's County Attorneys ("the State"). Plaintiffs' Complaint asks the Court to declare § 692A.2A unconstitutional on a number of theories, and Plaintiffs further request that the Court permanently enjoin the State from enforcing the law. By Order dated July 25, 2003, the Court certified this action as a class action. The Plaintiff class includes all individuals defined as a "person" by Iowa Code § 692A.2A(1), currently living in the state of Iowa, or who might wish to live in the state of Iowa, and excluding those individuals currently being prosecuted under Iowa Code § 692A.2A in the Iowa state courts. The Court also certified Plaintiffs' proposed Defendant class,

which includes all ninety nine of Iowa's County Attorneys, with J. Patrick White, the Johnson County Attorney, serving as class representative. Upon certifying both Plaintiff and Defendant classes, the Court granted Plaintiffs' motion to temporarily enjoin enforcement of Iowa Code § 692A.2A until the Court ruled on Plaintiffs' motion for a preliminary injunction. The parties, however, agreed to forego a preliminary injunction hearing and to proceed directly to trial with Defendants consenting to the Court's injunction remaining in effect throughout the litigation process.

Plaintiffs' challenge to Iowa Code § 692A.2A is that the law infringes upon a number of constitutional rights, including Plaintiffs' substantive due process rights of family privacy and freedom to travel, the Fifth Amendment right against self-incrimination, the Eighth Amendment's guarantee against cruel and unusual punishment, and the right to procedural due process. Plaintiffs further contend that Iowa Code § 692A.2A is an unconstitutional ex post facto law when applied to those class members who committed their crimes before July 1, 2002. Defendants counter that the Act is a lawful exercise of the State's police power and a constitutional effort to protect children from dangerous individuals. The Court heard testimony and received evidence from both sides during a two-day bench trial on December 15 and December 16, 2003. At the Court's behest, both sides filed post-trial briefs on January 9, 2004, and the matter is now fully submitted. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now sets forth its findings of fact and separate conclusions of law thereon as detailed below.

## I. FINDINGS OF FACT

### A. Iowa Code § 692A.2A

On May 9, 2002, Iowa Governor Thomas Vilsack signed Senate File 2197 into law.

Effective July 1, 2002, Senate File 2197, now codified at Iowa Code § 692A.2A, states in full:

> 692A.2A Residency restrictions—child care facilities and schools.
>
> 1. For purposes of this section, *"person"* means a person who has committed a criminal offense against a minor, or an aggravated offense, sexually violent offense, or other relevant offense that involved a minor.[1]
>
> 2. A person shall not reside within two thousand feet of the real property comprising a public or nonpublic elementary or secondary school or a child care facility.
>
> 3. A person who resides within two thousand feet of the real property comprising a public or nonpublic elementary or secondary school, or a child care facility, commits an aggravated misdemeanor.
>
> 4. A person residing within two thousand feet of the real property comprising a public or nonpublic elementary or secondary school or a child care facility does not commit a violation of this section if any of the following apply:
>
>   a. The person is required to serve a sentence at a jail, prison, juvenile facility, or other correctional institution or facility.
>
>   b. The person is subject to an order of commitment under chapter 229A.
>
>   c. The person has established a residence prior to July 1, 2002, or a school or child care facility is newly located on or after July 1, 2002.
>
>   d. The person is a minor or a ward under a guardianship.

Where applicable, the Act restricts the area in which a person may reside to places that are not within two thousand feet from a school or child care facility.[2]

---

**1.** Within the definition of person in § 692A.2A (1), the terms "criminal offense against a minor," "aggravated offense," "sexually violent offense," and "other relevant offense" are specially defined. *See* Iowa Code § 692A.1 (1), (5), (7), and (9).

**2.** Laws restricting where sex offenders may live are relatively new and somewhat unique in other jurisdictions. Twelve states other than Iowa have enacted some form of residency restriction applicable to sex offenders. *See* **Alabama**, Ala.Code § 15–20–26 (1999) (restricts sex offenders from residing or accepting employment within 2000 feet of school or child care facility); **Arkansas**, Ark.Code Ann. § 5–14–128 (2003) (unlawful for level three or four sex offenders to reside within 2000 feet of school or daycare); **California**, Cal. Pen. Code § 3003 (as amended 2003) (parolees may not live within 35 miles of victim or witnesses, and certain sex offenders on parole may not live within a quarter mile from a primary school); **Florida**, Fla. Stat. Ann. § 947.1405(7)(a)(2) (released sex offender with victim under eighteen prohibited from living within 1,000 feet of a school, day care center, park, playground, or other place where children regularly congregate); **Georgia**, GA.Code Ann. § 42–1–13 (2003) (sex offenders required to register shall not reside within 1,000 feet of any child care facility, school, or area where minors congregate); **Illinois**, 720 Illinois Comp. Stat. § 5/11–9.3 (b–5) (as amended 2000) (child sex offenders prohibited from knowingly residing within 500 feet of schools); **Kentucky**, Ky.Rev.Stat. Ann. § 17.495 (2000) (registered sex offenders on supervised release shall not reside within 1000 feet of school or child care facility); **Louisiana**, LA.Rev.Stat. § 14:91.1 (sexually violent predators shall not reside within 1000 feet of schools unless permission is given by school superintendent); **Ohio**, Ohio Rev.Code Ann. § 2950.031 (2003) (sex offenders prohibited from residing within 1000 feet of school); **Oklahoma**, 57 Okl. Stat. § 590 (2003) (prohibits sex offenders from residing within 2000 feet of schools or educational institutions); **Oregon**, Or.Rev.Stat. § 144.642, 144.643 (incorporates general prohibition on supervised sex offenders living near places where children reside); **Tennessee**, Tenn.Code. Ann. § 40–39–111 (2003) (sex offenders prohibited from establishing residence within 1000 feet of school, child care facility, or victim).

Residence is defined as "the place where a person sleeps, which may include more than one location, and may be mobile or transitory." Iowa Code § 692A.1(8). As the restriction is limited to one's residence, § 692A.2A does not otherwise prohibit an individual's presence within the restricted zone; affected persons are free to travel, work, or generally move about within any area. The Act contains no time frame regarding when a person committed his or her crime, but does include a limited "grandfather clause," whereby an individual who has established a residence prior to July 1, 2002 is exempted from the area restrictions. *See* Iowa Code § 692A.2A (4)(c). The text of § 692A.2A also indicates that sex offender who establish legal residences after July, 1 2002 will be exempted from new restricted areas caused by the creation of a new school or child care facility after the effective date. *See id.* Finally, § 692A.2A gives no indication as to how long the restriction will apply to any given individual.

## B. Child Care Facility

"Child care facility," as the term is used in § 692A.2A, is defined at Iowa Code § 237A.1. Iowa Code § 692A.1(2). Under § 237A.1, a child care facility is "a child care center, preschool, or a registered child development home." Iowa Code § 237A.1(5). The same code section defines a "child care center" as "a facility providing child care or preschool services for seven or more children, except when the facility is registered as a child development home," and "preschool" as "a child care facility which provides to children ages three through five, for periods of time not exceeding three hours per day, programs designed to help the children to develop intellectual skills, social skills, and motor skills, and to extend their interest and understanding of the world about them." Iowa Code § 237A.1(4), (13). A

"child development home" is "a person or program registered under section 237A.3A that may provide child care to six or more children at any one time." Iowa Code § 237A.1(7).

Currently, the only available list of child care facilities is a database maintained by the Iowa Department of Human Services ("DHS"). Plaintiffs' witness Jodi Caswell, a DHS administrator responsible for overseeing the registration of child development homes, explained that the database is maintained at the state central offices and is not published. Plaintiffs' contend that they received a copy of the list only after filing an open records request and paying a seventy dollar fee.

Ms. Caswell testified that the central database is updated daily. Ms. Caswell further explained that the turnover rate for child care facilities is frequent and could be high. Plaintiffs produced database reports from 2002 and the most current 2003 database to show the extent to which the database can change over a given year. (Plaintiffs' Ex. 60—61). The 2002 list contains 7462 daycare locations and is 258 pages long. (Plaintiffs' Ex. 60). Although the 2003 database lists only 7172 locations, 1921 of these are new from the 2002 database. (Plaintiffs' Ex. 61). In several instances, the listings contain no physical address or only a post office box number, but Ms. Caswell testified that an applicant is supposed to provide a physical address.

As Ms. Caswell testified, registering as a child development home requires an individual to meet certain requirements and to complete a one page application. At the most basic level, an individual can apply to register as a Category A child development home, so long as the applicant is at least eighteen years old, provides three letters of reference, and has a smoke de-

tector and fire extinguisher in the house. *See* Plaintiffs' Ex. 48. DHS also conducts criminal background checks on the applicant, employees, and any person over the age of fourteen living in the home. There is no fee for the application and the registration is valid for two years.

## C. Implementation of Iowa Code § 692A.2A

John Werden, the Carroll County, Iowa, county attorney testified for the State on the steps taken to implement § 692A.2A in his county. Werden stated that after reviewing the Act, he contacted the Carroll County information technology department and asked them to produce maps generally locating the county's schools and child care facilities. To produce the maps, Werden explained that the county utilized a Geographic Information Systems ("GIS") system, ordinarily used by the county for tax assessment purposes, to input the locations of schools and child care facilities. County officials then manually selected parameters and defined the two thousand foot buffer areas around the locations. The maps are continuously updated as locations are added or removed from the database.

Werden conceded that the maps produced were not accurate to the foot because of at least two variables. First, Werden explained that the GIS system relies on aerial photographs to establish geographic layers and to pinpoint given locations. Once the locations were established from the GIS system, a question arose regarding where to place the origin of the two thousand foot circles; circles could either be drawn based on the outer perimeter of a school or child care facility's property boundaries or from the center of the property. Werden testified, however, that the maps his office provided to local law enforcement "were not meant to be to

exact scale," but "a reasonable way to provide general guidance."

In addition to the difficulties with scaling accuracy as described above, the map produced by Carroll County also failed to accurately reflect the locations of all schools and child care facilities in the county. As Werden admitted at trial, a daycare center in the town of Breda was mistakenly omitted from the maps produced for law enforcement and for trial. After correcting the map to reflect the location, the entire town was encompassed by a restricted area.

Plaintiffs also presented the Court with maps from numerous jurisdictions throughout Iowa other than Carroll County. Plaintiffs noted, however, that not all counties or jurisdictions have created maps showing restricted areas. Plaintiffs indicate that, among others, no maps exist for the cities of Cedar Rapids, Davenport, Burlington, Newton, or Fort Dodge. In other counties, the responsibility for developing maps has been delegated to the towns and cities within the county. Plaintiffs used as an example, Johnson County, where no countywide map exists. Rather, maps from towns in Johnson County were prepared by the Iowa City and Coralville police departments. Although the evidence indicates that not all jurisdictions that have created maps did so in the same fashion as Carroll County, the specific processes used to create each map is not clear.

Lieutenant Ronald Wenman of the City of Coralville Police Department testified about the process of implementing and enforcing § 692A.2A in that town. Wenman stated that when the Act was first enacted, he researched it as best he could and attended a training seminar conducted in Des Moines by the Iowa Department of Criminal Investigation. Wenman also assumed the responsibility for attempting to

map the city of Coralville to identify restricted areas. In going about the process, Wenman explained that he had personal knowledge of where public schools and commercial daycare centers were located, and that he obtained a list of registered child care facilities from DHS to supplement his knowledge. Wenman provided this information to the city engineering department which then overlaid two thousand foot circles around each of the locations.

Notice of the change in law was provided to sex offenders by the Iowa Department of Public Safety, Division of Criminal Investigation. As Defendants' witness Joanne Tinker, the public service supervisor overseeing the sex offender registry, testified, notices were generated directly from the sex offender registry database and were sent to the registrant's last home address, regardless of whether the offender's victim was a minor. The notices included a portion of the text of § 692A.2A, but did not state whether the registrant was subject to the residency restriction described therein. As well, the notice did not include the exemptions to the restriction contained in the Act.

## D. Effect of Iowa Code § 692A.2A on Housing

Both parties presented evidence and testimony to detail the significant effect that Iowa Code § 692A.2A has had on available housing for those offenders covered under the law. Perhaps most compelling are the maps detailing the restricted areas in various jurisdictions. In larger cities such as Des Moines and Iowa City, the maps show that the two thousand foot circles cover virtually the entire city area. *See* Plaintiffs' Ex. 9a, 11a. The few areas in Des Moines, for instance, which are not restricted, include only industrial areas or some of the city's newest and most expensive neighborhoods. In smaller towns that have a school or child care facility, the entire town is often engulfed by an excluded area. *See* Plaintiffs' Ex. 12b–12h. In Johnson County alone, the towns of Lone Tree, North Liberty, Oxford, Shueyville, Solon, Swisher, and Tiffen are wholly restricted to sex offenders under § 692A.2A. Unincorporated areas and towns too small to have a school or child care facility remain available, as does the country, but available housing in these areas is not necessarily readily available.

Carroll County Attorney John Werden testified about the effect that § 692A.2A has had on housing in his county. As Werden explained, and a map of Carroll County shows, the majority of Carroll County remains available for sex offenders. The large majority of this area, however, is unincorporated farmland. Cities and towns in Carroll County follow the same pattern as those in the rest of the state. The City of Carroll, with a population of just over ten thousand, is all but completely blocked off. There are small areas around the edge of town that are not restricted, but Werden testified that only the areas to the north and south of town have residences. Certain small towns such as Halbur and Breda are completely restricted while other small towns without schools or child care facilities are completely available; the difference typically being the presence of one restricted location. The town of Breda appears completely available on the map, but Werden explained that this was a mistake. The town, in fact, has a registered private daycare center. With the error corrected, the town of Breda is entirely restricted from persons covered under § 692A.2A.

Werden also provided actual numbers of housing that remains available in Carroll County for affected sex offenders. The housing statistics provided do not indicate

whether units are rental properties or owner occupied, nor do they state the number of vacancies. In defining a residential unit, Werden explained that any dwelling was included, such that an apartment complex with four apartments would be counted as four units.

Defendants' Exhibit WC shows that of 9019 residential units in Carroll County, 6942 units are inside restricted zones and 2077, or twenty three percent, of housing units are not in restricted areas. Of the 2077, however, all but 383 residential units are in unincorporated areas. Werden conceded that the units in the unincorporated areas are mainly farmhouses, but noted that the trend towards larger farms has created some vacancies where the one who lives in the farmhouse no longer farms the land. Of the remaining 383 units, 244 are located in towns without a school or child care facility, leaving 139 possible housing units for sex offenders who want neither to live in a town so small that it has no services, nor in an unincorporated area. As a result, in towns and cities in Carroll County that are not completely available or completely restricted, barely two percent of housing is available to persons to § 692A.2A.

### E. Sex Offenders

As of December 1, 2003 there were approximately 5674 sex offenders registered in the state of Iowa. (Defendants' Ex. WA).[3] Of the victims attributed to these offenders, 5073, or eighty three percent,

were under the age of eighteen.[4] *Id.* By far, the largest percentage of victims are females ages eleven to seventeen, with 2812, or 45.9 percent of total victims. Six to ten year old females rank as a distant, but disturbing, second with 1065 victims or 17.4 percent of all victims. *Id.* The statistics show that anyone of almost any age could be either the victim of a sex offender or the perpetrator of a sex offense. The average age for offenders is twenty three years old; female victims average thirteen and male victims average a mere eleven years old. *Id.* The youngest victims in Iowa have not even reached their first birthdays.

Plaintiffs presented testimony and affidavits at trial from sixteen sex offenders, the wife of one of the sixteen, and the mother of a seventeenth offender. As in the Court's previous Order, the Court shall refer to the Plaintiff class members using the John Doe pseudonyms assigned by Plaintiffs' counsel.

1. ***John Doe I*** successfully completed probation after being convicted of second degree sexual assault under Wisconsin law in 1994 for having consensual sex with a girl who was fourteen years eleven months old when he was eighteen years and two months old. Under Iowa law, John Doe I's actions would not constitute a crime[5], but he was nonetheless required to register as a sex offender when he moved to Iowa to attend the University of Iowa. He is not listed on the online Iowa Sex Offender Registry ("ISOR").[6]

---

**3.** Defendants' witness Joanne Tinker explained that approximately 800 of the registered sex offenders reside out of the State.

**4.** Defendants' Ex. WA actually lists 7796 total victims. Of these, however, 1679 are classified as "sex not listed." The exhibit goes on to provide information on male and female victims in a given age range, but does not include information where the sex is not listed. Excluding these victims then, the number

of victims for which the Court was provided demographic information is 6117.

**5.** Pursuant to Iowa Code § 709.4(2)(c)(4), where the younger party is fourteen or fifteen, third degree sexual abuse occurs only where the other party is more than four years older.

**6.** The online Iowa Sex Offender Registry lists only those persons who have been assessed as moderate or high risk for re-offense. *See*

John Doe I currently resides in Johnson County, Iowa, in an apartment that is within the restricted zone under § 692A.2A. John Doe I originally signed a lease for an apartment prior to July, 1, 2002 and was exempted under § 692A.2A (c)(4). On August 1, 2003, John Doe I moved into a new apartment in the same apartment complex. Upon so doing, he was initially told that the move might be considered a change of address that would require him to re-register and lose his exempt status. In September 2003, however, the Johnson County Attorney informed him that the new apartment would also be exempted under the grandfather clause.

2. *John Doe II* pleaded guilty to third degree sexual abuse in August 2002 for having consensual sex with a fifteen year old girl when he was twenty years old. During the fall of 2002, John Doe II lived in a halfway house in Johnson County, Iowa. To be released from the halfway house, John Doe II was required to secure a residence that was acceptable to his counselor and parole officer. John Doe II had difficulty finding housing that complied with § 692A.2A, and he remained in the halfway house for longer than otherwise necessary until he found suitable housing in November 2002. John Doe II was evicted from this apartment in April 2003 because of problems with rent. He began looking for another residence, but had difficulty finding housing that was both within his budget and in compliance with the two thousand foot restriction. In searching for housing, John Doe II was assisted by Margie Stanton of the Johnson County Sheriff's Department, who would advise him on whether a given location was outside of a restricted area. Even with this assistance, John Doe II was unable to find legal housing in part because of the two thousand foot restriction and in part because of his own credit problems. John Doe II currently resides in Johnson County, Iowa at a location that would be in violation of § 692A.2A but for the Court's injunction. He remains on probation, and his probation officer is aware of his current living situation. The online ISOR lists John Doe II as a moderate risk for re-offense.

3. *John Doe III* was released from prison in July 2000 after serving nearly half of a ten-year sentence for third-degree sexual assault. He is listed on the ISOR as a moderate risk to re-offend. John Doe III owns a home in Davenport, Iowa but he has had a difficult time making his mortgage payments in large part because employers have been unwilling to retain him upon learning of his criminal history. John Doe III is engaged to a woman who owns a home in Clinton County, Iowa where she lives with her two minor children. John Doe III would like to live with his fiancee in her home, but would be unable to do so under § 692A.2A because the house is within a restricted area.

4. *John Doe IV's mother* testified about her efforts to find her son legally acceptable housing after he received parole on June 10, 2003. John Doe IV was in prison because of multiple drunk driving offenses. He is subject to the restrictions of § 692A.2A because of a 1992 offense against a minor that was adjudicated in juvenile court because John Doe IV was fourteen years old at the time. When her son received parole, John Doe IV's mother had intended that he come live with her in Mason City, Iowa. Before he could leave prison, however, John Doe IV had to have an approved place to live, and his mother's house was within a restricted area. John Doe IV's mother worked with his parole

Iowa Code § 692A.13(3)(c); http://www.iowa-sexoffender.com.

officer to find him a place to live, but learned that most of Mason City was restricted. She did try to find him a place at two locations that she was told about, but was unable to find any vacancies. John Doe IV was paroled to his mother's house after the Court entered its injunction. John Doe IV has since absconded.

5. *John Doe VI* pleaded guilty to the charge of sexual abuse in the second degree in 1993 and was sentenced to twenty-five years in prison. While in prison, John Doe VI completed the sex offender treatment program and was paroled to Polk County, Iowa in February 2002. John Doe VI remains on supervised parole until 2005, and he currently participates in after care sex offender treatment. His risk status on the ISOF is high.

John Doe VI began looking for a house to purchase for himself and his elderly and infirm mother in January 2003. He found a home within the city limits and measured the distance from the house to the two nearest schools with his car odometer. Believing that the house was not within a restricted area, he checked with the Des Moines Police Department and was told that the address complied with § 692A.2A. About six weeks after John Doe VI and his mother moved into the house on April 1, 2003, his mother received a call from the Des Moines Police Department Sex Offender Division stating that John Doe VI would have to move out as the house was actually within two thousand feet of a school. John Doe VI found and moved to a legally acceptable apartment in a Des Moines suburb, but was unable to maintain payments on both the apartment and the house. After being forced to move from his house, John Doe VI suffered a heart attack and incurred substantial medical bills in addition to the two housing payments. Shortly before the Court enjoined enforcement of § 692A.2A, John Doe VI was told to move out of the apartment as the owner did not want to rent to a sex offender. Upon issuance of the injunction, John Doe VI moved back into the house he had purchased with his mother. He states that if § 692A.2A is allowed to stand, he will have to sell the house as he can not afford two housing payments.

6. *John Doe VII* lives with his wife, their two children, and his mother-in-law in a two bedroom apartment in rural Linn County, Iowa. He must register as a sex offender in Iowa because he was convicted of the crime of indecent liberties with a child under Kansas law.[7] As with John Doe I, John Doe VII's actions would not have been criminal under Iowa law. The ISOR lists John Doe VII as a moderate risk to re-offend.

John Doe VII's wife gave birth to their second child in early December 2003. Shortly before the new arrival, his wife's mother also moved into their apartment for financial reasons. The apartment is too small for the family and John Doe VII wishes to move to make room for everyone. John Doe VII states that he has investigated as many as forty locations in Cedar Rapids, Iowa, but none are beyond two-thousand feet from a school or child care facility. The Linn County Sheriff's Department will not provide John Doe VII with a list of places to live in Cedar Rapids, but claim that they know of a few places on one side of town. The Sheriff's Department will not tell John Doe VII where these places are, and he has been unable to find a legally acceptable residence. Because of his crime, John Doe VII's probation officer does not want him

7. The statutory crime of indecent liberties with a child, Kan. Stat. Ann. § 21–3503 replaced what was commonly known as statutory rape. *State ex rel. Hermesmann v. Seyer,* 252 Kan. 646, 847 P.2d 1273, 1276 (1993).

living next to a high school, but has no problem with John Doe VII living near a daycare center.

**7. John Doe VIII** was convicted of the aggravated misdemeanor of sexual exploitation of a minor under Iowa Code § 728.12(3) for possessing improper pictures from the internet. Because his crime involved an offense against a minor, John Doe VIII is subject to the residency restriction of § 692A.2A. John Doe VIII is classified as a high risk to re-offend.

John Doe VIII attempted to find legal housing in the Iowa City area, but was unable to find anything that he could afford. He did find one possible location, but his application was denied because of his criminal record. After unsuccessfully searching for housing, John Doe VIII moved into his parents' home with the consent of his probation officer though the home was in a restricted area. He lived with his parents in Iowa City until his recent move to another city with his girlfriend. This new residence is also within two thousand feet of a school or child care facility. John Doe VIII was charged with assault and driving under the influence in fall of 2003, and he expects that he will be sent to prison once he is sentenced for these crimes.

**8. John Doe IX** was also convicted under Iowa Code § 728.12(3) for downloading inappropriate material from the internet that involved minors. After being placed on probation for two years in June 2003, John Doe IX registered with the Johnson County Sheriff's Department and was given a list of four apartments that would be legally acceptable. John Doe IX looked into each of the four apartments, but learned that none of the listings had any current openings. He is currently living with his wife in an apartment that would be in violation of § 692A.2A but for the Court's injunction, and he states that he does not know where he would find a place to live if the law were upheld. John Doe IX is not listed on the online ISOR.

**9. John Doe X** was convicted of a serious misdemeanor for violating Iowa Code § 709.14, lascivious conduct with a minor. John Doe X has been discharged from probation and is not included on the published list of sex offenders because he is classified as a low risk to re-offend.

John Doe X and his wife both receive Social Security disability payments because of mental retardation and mental illness. John Doe X has no regular employment, but he occasionally finds work through government-sponsored work groups. As John Werden, the Carroll County Attorney, confirmed at the July 14 hearing, John Doe X cannot live anywhere in the City of Carroll because of the 2000 feet restriction. To comply with the two thousand foot restriction then, John Doe X moved to an apartment complex outside of Carroll, Iowa that is substantially more expensive than any apartment he could have obtained in town. Since moving, his mental and physical health have deteriorated. Because of the restriction, John Doe X was unable to obtain some subsidized housing otherwise available for mentally disabled individuals.

**10. John Doe XI** has lived at his parents' house in Cedar Rapids, Iowa since before July 1, 2002, and is exempted from § 692A.2A so long as he remains there. In addition to their adult son, however, John Doe XI's wife and John Doe XI and his wife's fifteen month old daughter and six month old son also live in his parents' house. As might be expected, the stress on all parties has been great. John Doe XI and his wife have searched for a new residence but were unable to find an apartment that was either not in a restricted area or that would accept John Doe XI given his criminal history. John Doe XI

and his wife eventually purchased a house that is within two thousand feet of an elementary school. John Doe XI's probation officer has no objection to him living in the house save for § 692A.2A. John Doe XI was convicted of committing lascivious acts with a thirteen year old girl in August 2000. He is classified as a high risk to re-offend.

11. *John Doe XII* pleaded guilty to an aggravated misdemeanor charge of assault with intent to commit sexual abuse in Johnson County, Iowa in 2001. At the time of the offense, both John Doe XII and his victim were seventeen years old. He successfully completed two years of probation in August 2003 and is classified as a low risk to re-offend. He is not listed on the online ISOR.

John Doe XII is a student at a college in Iowa. During his freshman year in 2001 and 2002, he lived in the school dormitories with the consent of his probation officer as § 692A.2A had not yet gone into effect. He relied on grant money to cover the cost of his room and board while at school. John Doe XII returned to his parents' house the following summer and was living there when § 692A.2A went into effect. When he returned to school in August 2002, he was told that he could no longer live in the dorms because of a nearby child care facility. Unlike John Doe I, the fact that John Doe XII had signed a housing contract prior to July 1, 2002 was of no consequence. John Doe XII was also told that living in the dorms during his freshman year did not qualify him for exempt status under § 692A.2A(4)(c).

When he was told that he could not live on campus, John Doe XII returned to his parents' home, but continued to attend school full time. As he was not living in the school dorms, he was no longer eligible for grant or scholarship money to cover his room and board. Instead, John Doe XII made a two hour daily commute to attend classes, yet was still able to maintain over a 3.5 grade point average. Once the Court enjoined enforcement of § 692A.2A, John Doe XII moved back into the school dormitories and his housing scholarship was re-instated.

12. *John Doe XIII* pleaded guilty to the class D felony of lascivious acts with a child in 2000 for offenses against his six year old stepdaughter. He completed two different sex offender programs, was released from probation in August 2002, and is classified as a low risk to re-offend. John Doe XIII was living in Black Hawk County, Iowa when § 692A.2A went into effect. Although he was exempt from the residency restriction at the time under the grandfather clause, he was not able to afford the rent at that location and moved out. John Doe XIII looked for a more affordable residence in Black Hawk County but was unable to find anything that complied with the two thousand foot restriction. He, therefore, moved out of Iowa to his parents' home in Indiana, where he has lived since. His parents have now moved to Missouri, and John Doe XIII would like to return to Iowa, but is unable to find a place in Black Hawk County that would comply with § 692A.2A.

13. *John Doe XIV* pleaded guilty to a serious misdemeanor charge in 1995 when he was nineteen after exposing himself at a party where a thirteen year old girl was present. Because of his crime, he was required to register as a sex offender for ten years. After successfully completing two years of probation and a sex offender class, John Doe XIV is not considered a risk to re-offend, and he is not listed on the online ISOR.

John Doe XIV is now married and has two children, the second of which was born in September 2002. In the summer of 2002, John Doe XIV and his wife be-

gan looking for a larger place in Waterloo, Iowa in anticipation of the new baby. Although John Doe XIV had received a notice regarding the two thousand foot residency restriction, he mistakenly disregarded it because he did not think that it pertained to him. Instead, he and his wife found a house with shade trees on the street that they thought their daughter would love because of the elementary school playground around the corner. After moving into the new house on August 1, 2002, John Doe XIV registered the new address at the local sheriff's office as required by law. Upon so doing, he was told that he could not live in the house because of § 692A.2A's residency restriction and that he would be arrested if he did not move. John Doe XIV returned to the sheriff's office the next day to consult a map and learned that the only locations not restricted by § 692A.2A were in a very exclusive and high priced neighborhood. He then spent the next two months looking for a place in or around the Waterloo area. When nothing was found, John Doe XIV and his wife ended up financing one hundred percent of the cost of a house in a rural area about forty five miles from Waterloo. Because of the move, John Doe XIV now commutes an hour each way to work every day, and the family rarely sees their friends and family from the Waterloo area. John Doe XIV explained that the move was particularly hard on his four year old daughter, and that she often asks about moving back.

14. *John Doe XIV's wife* also testified about the effect of § 692A.2A on her and her family. Because of the residency restriction that her husband must abide by, she was forced to quit her job in Waterloo. She now works two jobs, but makes less than she did with her previous job. As there are no child care facilities near their home, John Doe XIV's wife must drive sixteen miles each way to take their two young children to a daycare center so that she can work to afford the housing payments. To remain with her husband and family she had to leave her own family and friends in the town she had lived her entire life. She explained that the stress caused by looking for a new place and abiding by the residency restriction while in the final months of her second pregnancy was immense and sometimes made her depressed and hysterical.

15. *John Doe XV* was serving a twenty five year sentence for the second degree sexual abuse of his former girlfriend's then ten year old daughter until he received a work release in May 2003. After completing the work release program, he was paroled in October 2003 to his mother's house. As his mother's house is within two thousand feet of a school, he would not have received the parole but for the Court's injunction. John Doe XV has purchased a trailer of his own and wishes to move there, but will be unable to under § 692A.2A because the trailer court where the trailer is located is within a restricted area. John Doe XV is considered a moderate risk to re-offend.

16. *John Doe XVI* appears on the sex offender registry because he had consensual sex with a thirteen year old girl when he was eighteen. He is classified as a high risk to re-offend. When § 692A.2A went into effect, John Doe XVI was living in a small one bedroom apartment with his pregnant girlfriend. When the child was born in August, 2002, John Doe XVI's father helped him purchase a condominium on the outskirts of Coralville, Iowa. After the Court entered its injunction, John Doe XVI and his family moved from the condominium into his childhood home. As the house is within a restricted area, he would not be able to remain there if the injunction is lifted.

**17. *John Doe XVII*** is not a member of the Plaintiff class as he is currently being criminally prosecuted for a violation of § 692A.2A. *See* July 25, 2003 Order § II(A)(5). John Doe XVII pleaded guilty to two counts of sexual abuse in the third degree in 1994 and was sentenced to twenty years in prison. He is classified as a high risk to re-offend. John Doe XVII was released from prison in June 2003. The prison notified the Webster County Sheriff's Department of John Doe XVII's intended address forty five days prior to his release, and the Sheriff's office raised no concerns at that time. After he was discharged from prison, John Doe XVII registered his new address with the Webster County Sheriff, but states that he was not told that the residence was within a restricted area though a daycare center was located in a nearby church. Within two weeks after registering his new address, John Doe XVII was arrested for violating the two thousand foot residency restriction of § 692A.2A. He is currently awaiting trial on the charge.

**18. *John Doe XVIII*** was convicted of lascivious acts against a minor for offenses against his stepdaughter. He completed the sex offender treatment program at Mt. Pleasant, Iowa and was given a work release by the board of parole in January 2003. He is classified as a high risk to re-offend.

John Doe XVIII desired to live with his adult son upon his release from prison, but was unable to because his son lives within two thousand feet of a school. After completing the work release program, John Doe XVIII moved to the country to comply with § 692A.2A. He believes that he would have received a parole rather than work release had he been able to live with his son. John Doe XVIII suffers from a number of serious medical problems, and he is concerned about living in the country where he does not have convenient access to a hospital and medical treatment.

## F. Expert Witness Testimony on Treatment, Restriction, and Supervision of Sex Offenders

### 1. Dudley Allison

Dudley Allison, an Iowa Department of Corrections parole and probation officer in Johnson County who specializes in the supervision of sex offenders, testified for the State. Mr. Allison holds a bachelor's degree in psychology and has been involved in training sessions for sex offender treatment. He does not consider himself a scientist, and he has done no clinical research on the treatment of sex offenders. From 1984 until the fall of 1996, Allison was a sex offender treatment manager at the Mount Pleasant Correctional Facility in Mount Pleasant, Iowa. During this time, he helped to develop and supervise the prison's sex offender treatment program. As a treatment manager, Allison facilitated group therapy and other treatment sessions for sex offenders.

Mr. Allison explained that when he worked at Mount Pleasant, treatment for sex offenders focused first on the individual offender acknowledging his or her past behavior and fighting through the minimizing, rationalizing, and excuses the offender relied on to justify the behaviors. Once the offender could acknowledge that his or her behavior was inappropriate, a relapse prevention plan was established to identify dangerous situations so the offender could, in the future, avoid the circumstances that led to the original offense. Both while offenders are incarcerated and once they are released, they participate in group and individual therapy sessions. As Allison explained, "sometimes an offense may be more of a situational thing, other times it may be almost a life long pattern of behavior; we have to consider that individually."

In his position as a parole and probation officer, Allison testified that he prepares risk assessments for the Department of Corrections. In so doing, he ranks individuals as a low, moderate, or high risk for re-offense based on a number of factors. Polygraph and plethysmograph tests are also used in the assessment process.[8] As noted above, low risk individuals are subject to fewer community notification requirements and do not appear on the ISOR website.

Allison testified that, as a parole and probation officer, he has the ability to place restrictions and limitations on the activities of the offenders he supervises. When crafting restrictions, Allison explained that he tries to have offenders avoid "dangerous situations," which depend on several variables defined by the individual offender such as the type of offense, the risk assessment, victim choice, and others. Allison noted that just as the variables differ based on the individual offender, restrictions and limitations would also be individualized to address the specific needs of a given offender. He provided the example of twenty year olds with fourteen and fifteen year old girlfriends. These men have committed sexual offenses against minors, but Allison stated that he did not find these people to be specifically dangerous to young minors. For other offenders, Allison testified that he might not want an offender working in a toy shop or spending his days staring at a playground or school across the street.

Mr. Allison opined that, based on his training and experience, he believes that there is a legitimate public safety concern regarding where sex offenders live. He testified, however, that as a parole and probation officer, he was able to deal with dangerous situations without § 692A.2A. As well, Allison admitted that placing sex offenders into residences designed to implement a particular offender's parole or probation plan would be easier without the Act. Allison explained that, when considering restrictions for an offender, he was more concerned with the circumstances and situation into which the individual was being placed than he was with a specific distance. When asked about any concerns he had about potential problems that could arise if a number of sex offenders begin living in the same apartment complex or residence, Allison replied, "if you put individuals together with like interests, and those interests are negative or deviant, then potentially they could be negative influences on each other."

### 2. Dr. William McEchron

The State introduced the transcript of Dr. William McEchron's expert witness testimony from a hearing on criminal defendant Keith Secring's motion to dismiss for failure to state a constitutional claim, in the Iowa District Court for Washington County. Defendants' Ex. MB. Dr. McEchron holds a Ph.D. in educational psychology from the University of Iowa, and maintains an office in Davenport, Iowa. His general practice includes seeing a variety of clients, including adults, children, and families, as well as doing work for custody evaluations. According to Dr. McEchron, "the majority of the practice is with people who have ... life's problems, depression, anxiety, that sort of thing." Defendant's Ex. MB at 27. He also testified that he sees "a lot of sex offenders"

---

8. As used in this setting, a plethysmograph is a device that measures changes in the circumference of the penis. During the test, a cuff, which Allison referred to as a "strain gauge," is placed around the subject's penis and any change in circumference is noted while the subject is presented with materials depicting various sexual scenarios, both appropriate and otherwise.

and that his work in this area includes group therapy, evaluations for private attorneys, and occasional Court evaluations for sentencing and risk assessment purposes.

According to Dr. McEchron, sexual offender behavior is not classified as a mental illness, but rather as a disruptive behavior. As did Mr. Allison, Dr. McEchron testified that a common element in the treatment of sex offenders is to first make them aware that they have done something wrong. Once this step is accomplished, treatment begins to focus on relapse prevention. The process of relapse prevention, Dr. McEchron explained, involves getting sex offenders to understand why they committed the offense. The process "varies from person to person," and "there are probably very few common elements." *Id.* at 37. He also identified "opportunity, knowing what the issues were in the person's life" as another component of relapse prevention, noting, for example, that re-offense can happen "during a particularly stressful time in their lives." *Id.* at 38.

When asked if there is a cure for sex offenders, Dr. McEchron answered "no," and went on to explain that, although there are some types of individuals with which they have had "a great deal of success" and "some that we feel very positive about", "there are never any guarantees that they might not re-offend." *Id.* at 29. Other individuals cause a much greater level of anxiety because they are prone to "a lot higher degree of re-offending." *Id.*

Dr. McEchron testified that he believed it is appropriate to place restrictions on sex offenders who are in his treatment and also under the supervision of the Department of Corrections. He explained that such restrictions are a "combined effort" that consists of a therapeutic component for which he is responsible, and issues of supervision and accountability in terms of

following Court orders, for which the Department of Corrections is responsible. Finally, this combined effort also includes "what we feel is best for that individual— to be successful in the future and to not re-offend." *Id.* at 30. Reasonable restrictions might include restricting a sex offender's access to children, "particularly if that's an issue," but Dr. McEchron went on to explain that "we can't say that all sex offenders offend against children, but certainly we're very concerned about their welfare, and you also have to define, you know, the age of the children, the relationship to the offender and so on." *Id.* at 31. Because there "were very high rates of re-offense for sex offenders who had offended against children," Dr. McEchron testified that he believed it would be appropriate to restrict places where sex offenders might come into contact with children if their victims were children. Dr. McEchron stated that the appropriateness of such a restriction is "common sense," although there is not sufficient data to allow them to know "where to draw the marks." *Id.* at 32. "Ideally, you would want to have most, if not all, the restrictions, lifted from a person before they're off of parole or probation to see how the offender does while there are still people involved in his life to keep an eye on him and see how he does in the real world." *Id.* at 39.

According to Dr. McEchron, removing restrictions would require "some judgment," and that "there's experience on the part of, particularly, the parole officers who use some judgment in terms of how can they let go of some of those restrictions." *Id.* He stated that the goal is to have the person be self-restrictive, which involves starting off with appropriate restrictions and then educating the individual on how to avoid high-risk situations. He identified "opportunity" and "temptation" as the main elements that create a serious

risk of re-offense when an offender finds himself around children, but Dr. McEchron identified the biggest risk as "what's going on inside the individual." *Id.* at 33–34. He explained that, "we have a real hard time controlling what's in a person's head and in their heart. That has to be their responsibility in the end." *Id.* at 34. Dr. McEchron agreed that controlling the opportunity and temptation to re-offend is the probable aim of restrictions that limit an offenders access to children and that reducing opportunity and temptation is extremely important to treatment.

When questioned about the factors that go into assessing the dangerousness of sex offenders or the likelihood of their re-offense, Dr. McEchron said such factors would include prior history, prior criminal history, the number of offenses, the number of sexual offenses, the victim's age, the victim's sex, the relationship to the victim, whether alcohol was involved, and whether mental illness was involved. He testified that he had not seen a variable that consists of the distance that one resides from a school or day care, nor was he aware of any studies that have presented evidence of recidivism rates that specifically look at the distance sex offenders live from a school or child care facility.

Dr. McEchron testified that a restriction that applies for the remainder of an individual's life, regardless of progress made in treatment, does not aid in the treatment process because such a restriction does nothing to help motivate the offender. Rather, Dr. McEchron admitted that such restrictions could actually be a problem for treatment because the restriction seems unfair to the individual offender. He agreed that the residency restriction might be a setback for a person who is doing well in treatment, stating that it, "might not always be the case, but it certainly isn't going to help him therapeutically. It's not going to help them towards a good attitude towards authority and society, and it may spiral them into depression." *Id.* at 51–52. Dr. McEchron further agreed that a law that would prevent a patient from living with, or being a part of, his or her family would be detrimental to the progress in treatment.

Sex offenders, Dr. McEchron explained, attempt to avoid the restrictions that have been placed on them in order to create the opportunity or temptation to re-offend. As such, Dr. McEchron stated that there are "a number of issues that we try to deal with in treatment that are probably more powerful" than restrictions might be for eliminating re-offense because of opportunity and temptation. *Id.* at 36. He listed victim identification, victim insight, relapse prevention, and any possible mental health and substance abuse issues as controls to identify and treat to avoid later temptations and opportunities. Dr. McEchron testified that, "if there are those controls, you have isolated the problem and made it more manageable for the offender." *Id.* at 36. Dr. McEchron stated that he knew of no particularly safe distance for those offenders who have not demonstrated self-control or adopted tools of relapse prevention. "There isn't any good, hard data on what the minimum or maximum is . . . I think it's what's inside the person's mind." *Id.* at 41.

### 3. Dr. Luis Rosell

Dr. Luis Rosell, a clinical and forensic psychologist in Mount Pleasant, Iowa, testified as an expert witness for Plaintiffs. Dr. Rosell has testified in five different states on behalf of convicted sex offenders in proceedings for the post-incarceration civil commitment of sexually violent predators. After receiving his master's degree in 1988, Dr. Rosell worked as a master's level psychologist at the Reception Center

in Baltimore, Maryland, a state run sex offender treatment program. Dr. Rosell received a doctorate in psychology in 1998. He has given numerous presentations on the topic of sex offender treatment. Dr. Rosell is also a member of the Association for the Treatment of Sexual Abusers (ATSA).

From October 1998 until April 2002, Dr. Rosell served as the program director of the sex offender treatment program in Mount Pleasant, Iowa. In this capacity, his duties included supervising the twelve to thirteen correctional counselors who provided the majority of the treatment, as well as the master's-level psychologists, who helped with evaluations.

In preparation for his testimony in this case, Dr. Rosell sent a mass email to his colleagues in the ATSA, asking for any research on residency restrictions for sexual offenders. Although the email was sent to the more than one thousand members, the only response came from Stephen J. Hout, director of the sexual offender treatment program for the Minnesota Department of Corrections. Hout referred Dr. Rosell to his study, based on the State of Minnesota's inquiry into residency restrictions, entitled Level Three Sex Offenders Residential Placement Issues. See Plaintiffs' Ex. 41. Dr. Rosell testified that, to his knowledge, this study is the only professional writing that has in some way attempted to address residential placement issues as they pertain to sexual offenders.

### a. Categorization of Sex Offenders

Dr. Rosell testified that it can be helpful to break sex offenders into different categories, "especially when it comes to determining risk." Categorization of offenders is based first on a victim type, such as pedophilia. From this initial determination, there are different subcategories

within pedophilia. The first subcategory depends on the sex of the victim, and the second subcategory delineates between incestual and non-incestual offenses. Dr. Rosell stated that the most common type of victim is one who has a familial relationship to their offender. While acting as program director in Mt. Pleasant, he observed that, at one time, of the 300 sexual offenders that were being treated, about forty nine percent had some form of relationship to their victim, and another twenty five to thirty percent knew their victims, either as friends, neighbors, or in a similar capacity. Dr. Rosell remarked that, in his experience, "stranger relationships," where the offender does not know his or her victim, "have always been the least common type of relationships." The final descriptor used to categorize offenders is "exclusive versus nonexclusive type," where exclusive type means that the offenders are only attracted to children and have no interest in adults. Nonexclusive type sex offenders are individuals who have adult relationships most of the time, but who have also committed offenses against children and meet the criteria for pedophilia.

A Swedish study which categorized sexual offenders by the modus operandi of the individual offenders has indicated that there can be stability in the offender's choice of victim. Dr. Rosell explained that the study, which looked at 1,400 subjects, found that seventy five of them re-offended. These seventy five were then broken down to examine the type of offense in which they had engaged. The study showed significant stability in regards to the offenders' choice of victims such that individuals that offended against males continued to offend against males, and so on. Offenders' choice of victim by age groups also remained stable. Dr. Rosell opined that, "if an individual offends

against 14 or 15 year old girls, they're most likely going to stay in that range."

### b. Recidivism Rates

In discussing recidivism rates, Dr. Rosell referred to a 1998 study conducted by Dr. R. Karl Hanson and Monique Bussière, entitled, Predicting Relapse: A Meta–Analysis of Sexual Offender Recidivism Studies. *See* Plaintiffs' Ex. 50. Dr. Hanson's study involved a large "meta-analysis," or a statistical study of other studies, that looked at sixty one studies with up to 28,000 subjects. They found that in a four- to five-year follow-up, 13.4 percent of child molesters re-offended and about 18.9 percent of adult rapists re-offended. Dr. Rosell also discussed a 2002 meta-analysis conducted by Dr. Hanson that examined the treatment outcome of 9,000 subjects. In that study, Dr. Hanson reported that among individuals that did not complete treatment, seventeen percent re-offended. Among those who did complete treatment, ten percent re-offended.

When asked to provide an opinion based on all studies that examine recidivism rates for sex offenders, Dr. Rosell placed the recidivism rate over twenty years for sex offenders as a whole around twenty to twenty five percent, but qualified his answer by saying, "a lot depends on the individual." As an example, he cited one study that found the recidivism rate to be about ten percent for incest offenders and twenty five percent for extra-familial offenders. Dr. Rosell agreed, however, that many, but not all, sex offenders will have to deal with their behaviors for the remainder of their lives. Over time though, Dr. Rosell stated, Dr. Hanson's study makes clear that recidivism rates will decrease. He explained, "it's believed that if an individual hasn't recidivated after 10 or 15 years, obviously they have learned the right way to go and that likelihood is decreased."

### c. Treatment and Restrictions

As a general method for treating sex offenders, Dr. Rosell explained that "each person is going to have a different factor that led them to engage in this inappropriate act or acts." As such, "the main thing about treatment is to identify all of those, then later assist ... the individual with [creating] coping mechanisms that can be implemented so that in the future, when they are confronted with similar situations, they don't act in the same way." Treatment restrictions are then considered based on the factors that led to the offending behavior to ensure that these elements are not duplicated when the individual is released from prison. Dr. Rosell explained that he would be concerned about whether the person had any substance abuse history and whether that was related to his offending behavior. Restrictions, he stated, "are going to be based on what type of victim they have."

Dr. Rosell agreed that specifically restricting a sex offender's access to children was a good idea, and explained that the children he would be concerned about restricting the offender from would depend on the type of offending behavior in which that individual had engaged. For example, this would involve distinguishing an extra-familial offender from an intra-familial offender, as "there are some offenders that offend only in the home, children, stepchildren, nieces, and cousins." Dr. Rosell challenged the societal belief that sex offenders are the "ones we read about who kidnap kids and then there is a big search for them," noting, "those are the exceptions, not the rules." According to Dr. Rosell, "we need to be more aware of the ones who we actually know who they are and we may even be related to them."

Dr. Rosell was also asked whether he believes it would be appropriate, in restricting access to children, to make the restriction apply to all minor children. He answered that the diagnosis is, "going to be made on an individual basis,"and agreed with Plaintiffs' counsel that a probation officer, parole officer, or someone in the prison system should be able to determine with some reasonable accuracy what are appropriate restrictions with regards to children.

Dr. Rosell stated that he was not aware of any literature suggesting that the distance or proximity to a school or daycare center is a factor in whether or not someone was going to re-offend. He testified that in Dr. Hanson's large meta-analysis he looked at an exhaustive list of factors. Proximity was not one of the factors addressed. When asked about the Minnesota study, which examined thirteen people over two years, Dr. Rosell said of thirteen level offenders who re-offended, in not one of the cases was the recidivism related at all to proximity or the 1,500 law. Dr. Rosell pointed to the study's third finding, which reads:

> There is no evidence in Minnesota that residential proximity to schools or parks affects re-offense. Thirteen level three offenders released between 1997 and 1999 have been rearrested for a new sex offense since their release from prison, and in none of the cases has residential proximity to schools or parks been a factor in the re-offense.

Plaintiffs' Ex. 41 at 11.

In response to questioning as to whether the distance that someone lives from a school has any impact at all with regard to re-offending, Dr. Rosell said, "not in general," and remarked that, "basically, if an individual wants to get children in, he can find ways." Plaintiff's counsel then asked whether the logic of that would have him

limiting people with regard to schools and parks and playgrounds and arcades. Dr. Rosell replied, "if an individual has that history. But not everybody has that type of history."

When asked by defense counsel whether he would agree that for those individuals who have a propensity or potential to re-offend, but who do not have parole or probation supervision, there is probably a good justification for this law, Dr. Rosell disagreed, stating, "I don't even think it would really make that much of a difference ... I don't believe that residential proximity makes that big of a difference. If an individual wants to offend, he will offend. It doesn't really matter how close the school is." Dr. Rosell went on to state that he did not feel that § 692A.2A was an appropriate or effective safeguard against re-offense, but he did agree that for a few offenders, such as those without intensive supervision, sound treatment would be to remove opportunities and temptations from the individual. By removing opportunity, the likelihood of re-offense is decreased, he explained, because by definition, if "the opportunity is not there, then you really can't offend." Because, however, § 692A.2A applies to all sex offenders with minor victims, Dr. Rosell reasoned that the law was not really appropriate from a "common sense modality." As he explained, "if an individual has victims of fifteen year-olds and he has shown no propensity to any attraction to children, being worried that he is a thousand feet from an elementary school is really not that—it's over-worry." According to Dr. Rosell, the two thousand foot restriction is too restrictive, and the law does not adequately address the danger to public safety.

When asked his opinion on whether the Act could actually be counterproductive with regard to making the community safer, Dr. Rosell stated that "it could be

counterproductive to the individual in numerous ways, which can make it another barrier that he deals with. Then maybe increase the likelihood of the individual becoming depressed and then giving up and who knows what an individual might do when they have just given up." He explained that depression could result because after the offenders "come out of prison already with having to register, community notification, they feel like a pariah." Furthermore, "if they are not allowed to go back and live with their wives or mothers or brothers, who is going to help them get back on their feet? Then it's just another barrier that they are having to deal with." Dr. Rosell testified that "a support system is important for everybody, not just the sex offender," and that "the support system might not be available to that individual if he has to live apart from them."

For the majority of offenders, Dr. Rosell noted, it is unnecessary to impose a residency restriction if those offenders are already under supervision by probation or parole officers. He stated, "I can only think of specific examples in which I thought it would be appropriate. Those are specific exceptions, not the general rule." He also testified that two thousand feet is an "extreme ... it is just pretty excessive." He added that it might not be effective "because the individuals who are going to go to a daycare or take a kid from a school, are usually very predatory and dangerous individuals, and those are the exceptions, not the rule." For these individuals, Dr. Rosell concluded, "it doesn't matter if it was a two mile radius that they could not be close to. If they want to take someone, they will."

## II. CONCLUSIONS OF LAW

To declare a legislative Act unconstitutional is "the gravest and most delicate duty that this Court is called upon to perform." *Blodgett v. Holden*, 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J. concurring). In so doing, "the rule is settled that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, [the Court's] plain duty is to adopt that which will save the Act. Even to avoid a serious doubt the rule is the same." *Id.*

The class of Plaintiffs represented here challenges the constitutionality of Iowa Code § 692A.2A on a number of grounds. First, Plaintiffs argue that the law imposes an unconstitutional punishment on those subject to the restrictions. Plaintiffs contend that by restricting where sex offenders may live, § 692A.2A in fact imposes a punishment that is the functional equivalent of banishment. Because the Act is punitive, Plaintiffs argue, retroactive application of the law to those individuals who committed their crimes before July 1, 2002 is a violation of the ex post facto clause of the United States Constitution.

Next, Plaintiffs contend that § 692A.2A unconstitutionally impedes on their substantive due process rights. Plaintiffs argue that the residency restriction infringes on the constitutionally protected right to travel because class members who may wish to return to Iowa or migrate to Iowa would not be able to because of the lack of legal housing. As well, those class members who were exempted from the restriction because they had established their residence prior to July 1, 2002, are unable to establish a new residence because there are so few places to live. Plaintiffs also argue that § 692A.2A infringes on the right to family privacy because the law restricts an individual's ability to associate and live with the family members of his or her choosing.

In addition to claiming that § 692A.2A infringes upon their substantive due process rights, Plaintiffs argue that the Act violates their Fourteenth Amendment right to procedural due process because the residency restrictions apply to all class members without providing sufficient notice, an opportunity to be heard, or any sort of review process.

Lastly, Plaintiffs contend that § 692A.2A violates both their Fifth and Eighth amendment rights against self incrimination and cruel and unusual punishments. Plaintiffs argue that the Act infringes on the Fifth Amendment right against self incrimination because sex offenders, by law, must register their addresses with local law enforcement. Failure to register is itself a criminal offense. *See* Iowa Code § 692A.7. If, therefore, an individual resides in a restricted zone, he will be admitting to a crime when he provides his address to comply with the registration law. As such, Plaintiffs contend that § 692A.2A forces offenders to unlawfully incriminate themselves. Plaintiffs also argue that § 692A.2A violates the Eighth Amendment's guarantee against cruel and unusual punishment, because excluding sex offenders from certain areas amounts to banishment. The Court will consider each claim separately.

## A. Ex Post Facto

The United States Constitution specifically bans both the federal government and the states from passing ex post facto laws. *See* Art. I, § 9, cl. 3 (federal government); Art. I, § 10, cl. 1 (state government). Literally, the Ex Post Facto Clause prohibits the passage of a law after the fact. *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798) (Chase, J., seriatim). Upon initial review, however, the United States Supreme Court stated that without explanation, the Clause is un-

intelligible and meaningless. *Id.* Consequently, the Court has spent more than two centuries deriving perspicuity from the otherwise ambiguous term of art. In dicta in a seriatim opinion in the 1796 case of *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648, Justice Samuel Chase described four categories of ex post facto laws:

1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.

*Id.* at 390. *More than two hundred years after Justice Chase identified his categories, the* Supreme Court continues to rely on this framework for analyzing laws under the ex post facto clause. *See e.g. Stogner v. California,* —— U.S. ——, ——, 123 S.Ct. 2446, 2450, 156 L.Ed.2d 544 (2003); *Carmell v. Texas,* 529 U.S. 513, 539, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000).

■ Members of the Plaintiff class who committed their crimes before July 1, 2002, the effective date of Iowa Code § 692A.2A, argue that the law is an unconstitutional ex post facto law as applied to them because the Act's residency restriction amounts to a punishment. Plaintiffs assert that the Act effectively banishes them from most towns and communities in Iowa. The residency restriction, Plaintiffs argue, punishes them a second time for their original sex crime. As such, Plaintiffs argument is that § 692A.2A falls with-

in Justice Chase's third category of ex post facto laws, a law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime when committed. *See Calder*, 3 U.S. (3 Dall.) at 390.

The State contends that there is no ex post facto problem because § 692A.2A does not punish actions that occurred prior the law's enactment. Rather, the State argues that the only criminal sanction involved is that imposed for violations of the residency restriction. *See* Iowa Code § 692A.2A(3). As such, an individual is not being punished for the prior sex offense, but for residing within a restricted area. The State likens § 692A.2A to criminal statutes prohibiting felons from possessing firearms. Under laws such as this, the individual is a felon and, therefore, subject to the law's restrictions by virtue of the past offense, not current conduct. Violation of the law, however, comes about because of events which can occur only after passage of the law. Here, the State argues, a sex offender falls within § 692A.2A's purview because of the prior sex offense. Any further criminal sanction under the law could occur only if a "person" under the law is found to reside in a restricted area after July 1, 2002.

Although initially attractive, the State's position fails to consider the fundamental premise of Plaintiffs' argument, the two thousand foot residency restriction itself constitutes a punishment.

## 1. Legislative Intent

██ When faced with the question of whether a given statute imposes a punishment, the Court must first "ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Smith v. Doe*, 538 U.S. 84, 92, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003) (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S.Ct.

2072, 138 L.Ed.2d 501 (1997)). If the legislature intended to impose a punishment, the inquiry is complete. *Id.* If, however, the intention of the legislature "was to enact a regulatory scheme that is civil and non-punitive," the Court "must further examine whether the statutory scheme is " 'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Id.* (quoting *Hendricks*, 521 U.S. at 361, 117 S.Ct. 2072 (quoting *United States v. Ward*, 448 U.S. 242, 248–249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980))). In making this determination, the Court should "ordinarily defer to the legislature's stated intent," and "only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quoting *Hendricks*, 521 U.S. at 361, 117 S.Ct. 2072; *Hudson v. United States*, 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (quoting *Ward*, 448 U.S. at 249, 100 S.Ct. 2636)).

The Iowa Supreme Court has stated, "the purpose of chapter 692A is clear: to require registration of sex offenders and thereby protect society from those who because of probation, parole, or other release are given access to members of the public." *In Interest of S.M.M.*, 558 N.W.2d 405, 408 (Iowa 1997). Iowa Code Chapter 692A, however, contains no such statement of purpose. In *State v. Pickens*, published on the same day and cited in *S.M.M.* as controlling, the Iowa Supreme Court specifically acknowledged the lack of clear legislative intent in Chapter 692A, noting "[u]nfortunately, we are not aided by an express legislative statement as to the underlying intent of the Iowa Legislature in enacting chapter 692A." *State v. Pickens*, 558 N.W.2d 396, 399 (Iowa 1997); *see In Interest of S.M.M.*, 558 N.W.2d at 405. The *Pickens* court went on to hold that the purpose of the sex offender regis-

tration requirements in chapter 692A are to protect the public, and not to punish sex offenders. *Pickens,* 558 N.W.2d at 400.

Although the Iowa General Assembly has not provided a clear statement of the legislative intent behind § 692A.2A to which the Court can defer, "where a legislative restriction 'is an incident of the State's power to protect the health and safety of its citizens,' it will be considered 'as evidencing an intent to exercise that regulatory power, and not a purpose to add to the punishment.'" *Smith v. Doe,* 538 U.S. at 93–94, 123 S.Ct. 1140 (quoting *Flemming v. Nestor,* 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)). Iowa Code § 692A.2A would appear to have been crafted for the same purpose as the remainder of chapter 692A, an exercise of the State's police power designed to protect the public from potentially dangerous individuals. As such, the Court must conclude that the intent of the Iowa General Assembly in passing the two thousand foot residency restriction in § 692A.2A, was to create a civil, non-punitive statutory scheme to protect the public.

## 2. Whether the effect of § 692A.2A is punitive

Having concluded that the intent behind § 692A.2A was civil and not punitive, the Court must now go further and consider whether the effect of the law is so punitive that it negates the State's attempt to craft civil restrictions. *See Smith v. Doe,* 538 U.S. at 92, 123 S.Ct. 1140; *Rem v. United States Bureau of Prisons,* 320 F.3d 791, 794 (8th Cir.2003) (citing *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).

Where the record lacks conclusive evidence that the legislature intended to enact a penal statute, the Court must consider the law on its face using the seven factors noted in *Kennedy v. Mendoza–*

*Martinez. See Smith v. Doe,* 538 U.S. at 97, 123 S.Ct. 1140 (citing *Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. 554). The tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character include:

> whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . .

*Mendoza–Martinez,* 372 U.S. at 168–69, 83 S.Ct. 554 (citations and footnotes omitted). These same factors apply in a number of constitutional contexts, and they are "neither exhaustive nor dispositive," *United States v. Ward,* 448 U.S. at 249, 100 S.Ct. 2636, but are "useful guideposts," *Hudson,* 522 U.S. at 99, 118 S.Ct. 488. *See Smith v. Doe,* 538 U.S. at 97, 123 S.Ct. 1140.

Recently, in *Smith v. Doe,* the Supreme Court referred to the *Mendoza–Martinez* factors when considering the punitive effect of Alaska's sex offender registration laws. In so doing, the Court noted that five of the seven factors were relevant to its analysis. *Smith v. Doe,* 538 U.S. at 97, 123 S.Ct. 1140. The Court reasoned that the two remaining factors, whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime, were of little weight because the "regulatory scheme applies only to past conduct, which was, and is, a crime." *Id.* at 105, 123 S.Ct. 1140. Because the same holds true in the present case, that the residency restriction

in § 692A.2A applies only because of prior criminal sex offenses, the Court's analysis relies on the same five factors used in *Smith v. Doe.*

### a. Whether the residency restriction has historically been regarded as a punishment

"A historical survey can be useful because a State that decides to punish an individual is likely to select a means deemed punitive in our tradition, so that the public will recognize it as such." *Id.* at 97, 123 S.Ct. 1140. In colonial times, "[t]he most serious offenders were banished, after which they could neither return to their original community nor, reputation tarnished, be admitted easily into a new one." *Id.* at 98, 123 S.Ct. 1140 (citing T. Blomberg & K. Lucken, American Penology: A History of Control 30–31 (2000)). Plaintiffs contend that the two thousand foot residency restriction imposed on them by Iowa Code § 692A.2A closely resembles this historical punishment, for offenders are effectively forced out and restricted from returning to their original community lest they be guilty of another offense.

On its face, § 692A.2A does not specifically banish sex offenders from Iowa's many communities. By simply specifying certain areas where sex offenders may not live, the Act would appear to differ from an order of banishment that forever casts a given individual away from the community. Practical application of the Act, however, reveals striking similarities between the two. Under § 692A.2A, sex offenders are completely banned from living in a number of Iowa's smaller towns and cities. In the State's major communities, offenders are relegated to living in industrial areas, in some of the cities' most expensive developments, or on the very outskirts of town where available housing is limited.

Although some areas are completely unrestricted, these are either very small towns without any services, or farmland. As well, should anyone in an available area decide that he or she no longer wants sex offenders to have the option of moving into the neighborhood, the individual need only register his or her home as a private child development home and a two thousand foot buffer zone emerges.

The effective result of § 692A.2A is that some sex offenders end up remaining in prison beyond their parole dates, choosing between living with their families or complying with the Act, going homeless or breaking the law, or simply leaving the State because no community has a legal space for them. The differences between a law that would leave a man in prison or cause him to go homeless rather than have him reside in the community, and an order forever banishing him, are very slight. As such, the Court finds that the regulatory scheme employed in § 692A.2A has historically been regarded as a punishment.

### b. Whether the Act imposes an affirmative disability or restraint

When determining whether a law subjects those within its purview to an "affirmative disability or restraint," *Martinez–Mendoza*, 372 U.S. at 168, 83 S.Ct. 554, the Court inquires "how the effects of the Act are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Smith v. Doe*, 538 U.S. at 99–100, 123 S.Ct. 1140. The affirmative restraint imposed by Iowa Code § 692A.2A is neither minor nor indirect. Rather, the Act very specifically restricts persons subject to it from living in certain areas under penalty of imprisonment. As noted above, those affected by § 692A.2A are almost completely restricted from living in any of Iowa's population centers. Unlike the registration

laws reviewed in *Smith v. Doe*, § 692A.2A does in fact restrain sex offenders from changing residences. *See Id.* at 100, 123 S.Ct. 1140. Testimony from the John Doe sex offenders in this case establishes a record replete with "evidence that the Act has led to substantial ... housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by employers and landlords." *Id.* As it were, § 692A.2A imposes exactly the affirmative restraint that the Supreme Court found lacking in Alaska's sex offender registration scheme. The Court, therefore, finds that § 692A.2A imposes an affirmative restraint on those subject to it.

### c. Whether the operation of § 692A.2A promotes the traditional aims of punishment

The third Martinez–Mendoza factor instructs the Court to consider "whether the operation [of § 692A.2A] will promote the traditional aims of punishment—retribution and deterrence." *Martinez–Mendoza*, 372 U.S. at 168, 83 S.Ct. 554. In *Smith v. Doe*, the State of Alaska conceded that the sex offender registration law at issue there might deter future crimes. *Smith v. Doe*, 538 U.S. at 102, 123 S.Ct. 1140. Although Iowa chooses not to consider the two thousand foot residency restriction a punishment, Defendants must concede that § 692A.2A goes even further to deter would-be sex offenders than does a registration and community notification system.

As well, § 692A.2A promotes retribution as the second aim of punishment. Under the Act, sex offenders are subject to the residency restriction regardless of whether they pose a danger to the population. Whether an individual is classified by the Iowa Department of Corrections as a high, low, or moderate risk to re-offend is irrelevant to the restrictions placed on where

that person might live. Additionally, no consideration is made of an individual offender's prior offenses or choice of victims. Many of the John Doe Plaintiffs testified that their parole officers would have had no objection to them living in a particular residence but for § 692A.2A. Both Drs. Rosell and McEchron testified that sex offenders tend to prefer a particular type of victim, and although crossover to different victim types does occur, it is not customary. Dr. Rosell also testified that those treating sex offenders feel most comfortable about a lessened chance of recidivism with those offenders who have not re-offended for a number of years. The residency restriction contains no time limit, and could potentially be enforced for the remainder of the offender's life. The Act, then, goes beyond what is necessary to protect the public and enters into the realm of retribution. Accordingly, the Court finds that § 692A.2A promotes both of the traditional aims of punishment, deterrence and retribution.

### d. Whether § 692A.2A may rationally be connected to an alternative purpose

There is no doubt that § 692A.2A has a purpose other than simply to punish sex offenders. The Iowa Supreme Court reasoned that the purpose of Iowa Code Chapter 692A as a whole is to "protect society from those who because of probation, parole, or other release are given access to members of the public." *In Interest of S.M.M.*, 558 N.W.2d at 408. Restated, the purpose of Chapter 692 is to protect the public from sex offenders. Given this purpose, it is certainly reasonable to conclude that restricting sex offenders from residing within two thousand feet of a school or child care facility might also protect society.

**e. Whether § 692A.2A is excessive in relation to its alternative purpose**

As noted above, the residency restriction in § 692A.2A goes beyond what is reasonably necessary to protect the public. The Act makes no consideration for the type of offender, type of offense, or the offender's risk of re-offending. That is, § 692A.2A applies regardless of whether a particular offender is a danger to the public. As such, the law goes beyond the alternative purpose for which it is related. The Court, therefore, finds that § 692A.2A is excessive in achieving its purpose of protecting the public.

After reviewing the effect of § 692A.2A under the *Martinez–Mendoza* factors, the Court concludes that the Act goes beyond the legislature's intent to craft a civil regulatory scheme and is, in fact, punitive. The scheme closely resembles that of the historical punishment of banishment. The residency restriction is an affirmative restraint on those subject to § 692A.2A. The Act would be effective at deterring future sex offenders by promoting and promising retribution for those who are convicted. Finally, the Act is connected to the alternative and compelling purpose of protecting the public, but it exceeds that which is reasonably necessary to accomplish this goal. As such, the Court holds that Iowa Code § 692A.2A is "so punitive in ... effect as to negate [the State's] intention to deem it civil." *Smith v. Doe*, 538 U.S. at 92, 123 S.Ct. 1140 (internal citations and quotations omitted). Application of § 692A.2A to those who committed their respective crimes before July 1, 2002, constitutes a retroactive punishment forbidden by the Ex Post Facto Clause of the United States Constitution.

**B. Substantive Due Process**

The Fourteenth Amendment to the United States Constitution mandates that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In addition to the "guarantee of fair procedure," the Due Process Clause also includes a substantive component, "which forbids the government to infringe certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (Due Process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'") (quoting *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986))).

In addition to the freedoms enumerated in the Bill of Rights, a long line of Supreme Court cases have held that the substantive Due Process Clause specially protects an individual's liberty interest in the rights to marry, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); to have children, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); to marital privacy, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); to use contraception, *id.;* to bodily integrity, *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); to abortion, *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); and to privacy and choice in one's personal and sexual relationships, *Lawrence v. Texas*, —— U.S. ——, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). The Supreme Court, however, has "always been

reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Collins,* 503 U.S. at 125, 112 S.Ct. 1061 (citing *Regents of Univ. of Mich. v. Ewing,* 474 U.S. 214, 225–226, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)).

There are two primary features of the established method of substantive due process analysis. *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). First, "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,'" *id.,* at 720, 117 S.Ct. 2258 (quoting *Moore v. East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion)); (citing *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) ("so rooted in the traditions and conscience of our people as to be ranked as fundamental")), "and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Id.* (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937)). Substantive due process also requires a careful description of the asserted fundamental liberty interest." *Id.* at 721, 117 S.Ct. 2258 (citations and quotation omitted). As the Supreme Court has stated, "[o]ur Nation's history, legal traditions, and practices thus provide the crucial 'guideposts for responsible decision making' that direct and restrain our exposition for Due Process Clause." *Id.* (quoting *Collins,* 503 U.S. at 125, 112 S.Ct. 1061).

### 1. Fundamental Rights

#### a. Right to Personal Choice Regarding Family Matters

The Supreme Court has often recognized a right to privacy and personal choice regarding family matters. As noted in *Roberts v. United States Jaycees,* 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), "in one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* at 617–18, 104 S.Ct. 3244.

> [T]he constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others. Protecting these relationships from unwarranted state interference therefore safeguards the ability independently to define one's identity that is central to any concept of liberty.

The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives. Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.

*Id.* at 619–20, 104 S.Ct. 3244 (citations omitted).

Plaintiffs contend that § 692A.2A infringes on their right to privacy and choice in personal affiliation because the act interferes with the ability of sex offenders to live with their family members.

Plaintiffs take examples from the John Doe testimony to show that in certain instances some offenders remain in prison though their families desperately want them to come home, and others are compelled to move away from their family and support network though both their family members and parole officers are comfortable with them living there. Other offenders are subject to arrest for attempting to live with their husbands or wives.

The State, on the other hand, dismisses Plaintiffs' "warm endorsement of family life" as "fallacious," because the argument "loses sight of the fact that many of the members of the Plaintiffs' class sexually molested their own sons, daughters, or grandchildren." Def.s' Br. at 6. Rather, the State argues that the residency restriction is no different from a zoning regulation as it prohibits certain uses of land within the jurisdiction.

From the outset, the Court flatly rejects the State's attempt to cast § 692A.2A as a zoning regulation. First, those who might violate a zoning regulation are not subject to a year in prison for their misdeeds. More basic though, is that zoning regulations do not identify a specific group of persons and mark off areas wherein they may not live subject to arrest. Were the class of people subject to the regulation other than convicted sex offenders, the State's forced segregation would prompt outrage. Without question though, sex offenders are not a suspect class, and the protections available to others when the segregation or discrimination is based on race, sex, or national origin are not available. Even so, the residency restriction goes well beyond that which anyone could reasonably argue is a zoning regulation.

The fundamental right that Plaintiffs assert is a right to privately choose how they want to conduct their family affairs. Included in this right is the right to determine those members of the family with whom one wants to reside. Although Defendants correctly identify that many of the Plaintiff class members committed their offenses against family members, this is not the case for all class members. Yet all class members are subject to the residency restriction. Moreover, the Act restricts free choice of association, not only for the offenders, but for their family members as well. Upon completion of the sex offender's penal sentence, the offender has paid his or her debt to society and should have the opportunity to start anew. If an offender's family wishes their relative to return, and the individual is not dangerous, then the choice should be theirs to make. Beyond the offenders, non-offender spouses should also be free from the Hobson's choice of whether to stay with the person to whom they are legally bound, which could involve moving away from the spouse's family, friends, and support network, maintaining separate residences, or dissolving the marriage.

The Court found the testimony of John Doe XIV's wife an exceedingly compelling and informative example of the effect § 692A.2A has on those who have done no wrong themselves. Before § 692A.2A went into effect, John Doe XIV's wife had a good job in the city where she grew up and where her family lived. She lived with her husband and their young daughter, and they had recently purchased their first home. After July 1, 2002, her life was thrust into a depressing turmoil when she learned that her husband would be arrested if he continued to live in the house they had just bought. After a frustrating search, she and her family moved away from her lifelong home to live forty five miles away in the country. Where she used to do her part to support the family with one job, she now works two and still has difficulties making ends meet. Be-

cause there are no child care facilities nearby, she drives an extra thirty miles every day to take her two children to daycare so that she can work two jobs that pay less together than the job she was forced to leave. She testified that she has suffered nervous breakdowns since moving and is often depressed. On many nights, her four year old daughter cries and asks when they will be able to go home. Yet she has remained by her husband's side and has honored her marital vows, even though doing so has caused extreme hardship. And she endures this all because three years before she even met him, her then nineteen year old husband exposed himself at a party where a thirteen year old girl happened to be present.

The right to privately choose how to conduct family affairs and decide where and with whom family members will live is held by the entire family; the sex offender is not the only factor in the domestic calculus. Inherent in the right is that the freedom of choice must permeate to all members of the family. As § 692A.2A interferes with these choices, the Court finds that the Act infringes upon Plaintiffs' fundamental right to govern their family affairs as they so desire and without undue interference from the State.

### b. Right to Travel

The Supreme Court has described the "constitutional right to travel from one State to another," *United States v. Guest,* 383 U.S. 745, 757, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), as a right so fundamental and important that it is "assertable against private interference as well as government action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all." *Saenz v. Roe,* 526 U.S. 489, 498, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999) (quoting *Shapiro v. Thompson,* 394 U.S. 618, 643, 89 S.Ct. 1322, 22 L.Ed.2d

600 (1969) (Stewart, J., concurring)). In *Saenz,* the Court noted three different components to the "right to travel." *Id.* at 500, 119 S.Ct. 1518. First, it guarantees that a citizen of one state may freely enter and leave another state. *Id.* Next, the right to travel ensures that visitors of another state are welcomed rather than treated as unfriendly aliens. *Id.* Lastly, the constitution protects the right of those who choose to travel to another state and make it their permanent home to be treated as an equal with other citizens of that state. *Id.*

Those members of the Plaintiff class who currently reside outside of the State of Iowa, but who would like to return to the State, allege that Iowa Code § 692A.2A infringes on the right to interstate travel because the Act effectively bans sex offenders from residing in large sections of Iowa's towns and cities. Plaintiffs living in Iowa contend that the Act infringes on the asserted right to intrastate travel. As Plaintiffs concede, however, whether the constitution protects intrastate travel as a fundamental right, as it does interstate travel, is less clear.

In *Johnson v. Cincinnati,* 310 F.3d 484 (6th Cir.2002), the Sixth Circuit Court of Appeals held, "[t]he Constitution protects a right to travel locally through public spaces and roadways." *Id.* at 498. The Court agrees. Protecting a right to intrastate travel comports with the principles behind the right to interstate travel. Whether an individual travels across many states or a single county, the right to be free to enter, leave, or remain in a place, and to be treated as an equal with current denizens, is a fundamental liberty guaranteed by our constitution.

The State argues that nothing in § 692A.2A precludes sex offenders from traveling into Iowa from other states. Defendants further contend that sex of-

fenders who choose to reside in Iowa are treated the same as other sex offenders regardless of whether the stay is temporary or permanent. As such, the State alleges that § 692A.2A neither discriminates against out of state travelers, nor does it infringe upon any sex offender's right to travel. The Court disagrees.

On its face, § 692A.2A restricts a person from residing within two thousand feet of a school or child care facility. "Residence" is defined at Iowa Code § 692A.1 (8) as "the place where a person sleeps, which may include more than one location, and may be mobile or transitory." As the term is defined, sleep is the only condition for establishing a residence that would be subject to the two thousand foot restriction. Thus, a person may have innumerable transitory residences that are newly established each time he is unfortunate enough to fall asleep. Literal application of the Act would result in the great majority of the State's hotels and motels being restricted to traveling sex offenders. As well, community centers such as homeless shelters and missions will most likely be unavailable to sex offenders because of location. A sex offender simply wanting to travel through the State might be compelled to avoid Iowa altogether lest he stop for the night at an acquaintance's home or a motel and thereby establish an unlawful residence by unwittingly falling asleep. Under § 692A.2A, sex offenders would appear to be able to travel Iowa freely only so long as they do not stop.

Beyond the literal extremes of the Act's scheme, § 692A.2A prevents sex offenders from either moving into or around the State. Those who wish to move into the State are left with very few avenues for obtaining legal housing. Sex offenders who established a residence in Iowa before July 1, 2002, are unable to even consider changing residences lest they lose their exempt status. As such, these individuals are forced to remain in dwellings that may be too small or expensive, or because of any number of conditions that might compel someone to seek out a new residence. For all practical purposes, the right to freely travel and move into or around the State is almost nonexistent for persons subject to § 692A.2A. The Court, therefore, finds that § 692A.2A infringes on Plaintiffs' fundamental right to interstate and intrastate travel.

### 2. Strict Scrutiny Analysis

Having found that Iowa Code § 692A.2A interferes with Plaintiffs' fundamental right to family choice and privacy, and the right to travel, the Court applies the "strict scrutiny" standard of review. The burden now shifts to the State to show that the Act is narrowly tailored to address a compelling State interest using the least restrictive means possible. *See Roe v. Wade,* 410 U.S. 113, 155–56, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (citations omitted).

Both sides agree that the State has a compelling interest in protecting children from sex offenders. The State argues that the law is narrowly tailored to meet this end because the residency restriction creates a buffer zone around schools and child care facilities, thereby reducing the "precursor events" leading to re-offense and eliminating nearby access to potential victims. The Court disagrees.

While restricting the access sex offenders have to children is likely to reduce the opportunity for re-offense, the State has offered no evidence demonstrating that a two thousand foot "buffer zone" around schools and child care facilities actually protects children. Rather, the State's expert witness, Dr. McEchron testified that the scheme could actually prove detrimental to a sex offender's treatment because

the offender may become depressed after deciding that society has given him no chance to rehabilitate. Both Drs. Rosell and McEchron, and Dudley Allison testified that they knew of no specific distance that would protect children. Dr. Rosell further explained that the residency restriction would not stop a determined offender from finding another victim.

Defendants produced no research showing the effect a proximity restriction has on sex offender recidivism rates. In the large meta-analyses, a number of variables are considered when reviewing recidivism, but proximity is not one of them. The one study that has reviewed the effect of restricting sex offenders from residing within a certain distance from locations frequented by children reported its findings unequivocally: "[t]here is no evidence . . . that residential proximity to schools or parks affects re-offense." Pl.s' Ex. 41 at 11. With nothing to suggest that restricting a sex offender from living within two thousand feet of a school or child care facility would actually protect children, the Court finds that § 692A.2A is not narrowly tailored to achieve a compelling State interest.

The Act also fails to apply the least restrictive means necessary to achieve its goal. As noted, the purpose of § 692A.2A is to protect children, yet the Act applies to all relevant sex offenders without consideration of whether the individual is actually a danger to the public. Risk assessments produced by the Iowa Department of Corrections show that not all sex offenders are made alike. Defendants' witness Dudley Allison testified that he has no problem with certain offenders living near schools or child care facilities because he does not find those individuals a danger to re-offend in such a situation. With the enormous restriction placed on the offender, the State cannot justify applying the

scheme to all Plaintiffs regardless of whether they pose a danger to the community.

The Court finds that § 692A.2A cannot survive strict scrutiny. There is no close fit between the restriction and the intended purpose of protecting children. The Act also goes too far in its attempt to meet a compelling State concern by restricting all offenders without regard to the actual danger to the community. The Court, therefore, holds that § 692A.2A unconstitutionally infringes on Plaintiffs' substantive rights under the Due Process Clause of the Fourteenth Amendment.

### C.  Procedural Due Process

■ The procedural arm of the Due Process Clause imposes certain restrictions on government decisions that deprive individuals of liberty or property interests. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Specifically, before a State may deprive an individual of a liberty or property interest, the State must provide the individual with notice and an opportunity be heard. *Id.* at 332–33, 96 S.Ct. 893. As the Court noted in *Mathews*, "[t]he 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'" *Id.* at 333, 96 S.Ct. 893 (quoting *Joint Anti–Fascist Comm. v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)).

Plaintiffs allege that § 692A.2A deprives them of their right to procedural due process under the Fourteenth Amendment because § 692A.2A provides no process to allow for an individualized determination of danger to the community, and the Act does not provide fair notice as to circumstances under which an individual could be prosecuted. Defendants argue that the

only private interest at issue is Plaintiffs' "preference to live within a convenient distance from work or other family, or in a more beneficial economic circumstance," and contend that the Court must balance this interest against the State's interest in protecting its children. Defs.' Br. at 13. First, the Court must query why sex offenders should not be able to live in residences that are affordable or convenient? Regardless, the Court rejects Defendants' proffered private interest as the Court has already determined that § 692A.2A infringes on a fundamental right.

To determine the specific dictates of due process, the Supreme Court has identified three distinct factors for the Court to consider: 1) "the private interest that will be affected by the official action;" 2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;" and 3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335, 96 S.Ct. 893.

As determined above, § 692A.2A infringes upon Plaintiffs' fundamental rights to travel and to privately make decisions regarding family. Accordingly, the private interest affected is significant. Currently there is no risk of erroneous deprivation of the interests because it is denied to all who meet the Act's criteria. Thus there is no decision at all. As a result, those who pose little or no danger to the public, or those who have been cleared to live in a particular residence by a supervising parole or probation officer, are deprived of their right to live where and with whom they so choose. Because the goal of § 692A.2A is to protect children, adding a process that would allow for an individual

determination of whether a given offender poses a threat would greatly bolster the procedural safeguard against unnecessary deprivation of Plaintiffs' fundamental rights. Lastly, in considering the cost to the State to allow for a hearing process to determine risk, the Court notes that the State currently has such a process in place. Sex offenders are classified according to risk at the time of their release from state custody. Because the determination of whether the offender is classified as a high, low, or moderate risk to re-offend affects a number of registration requirements under Iowa Code Chapter 692A, the Court is at a loss to understand why the State would do away with these classifications when imposing the most severe of restrictions on sex offenders. The Court, therefore, finds that § 692A.2A infringes upon Plaintiffs' right to procedural due process by failing to provide individuals with an opportunity to be heard before depriving them of protected liberty interests.

Plaintiffs further contend that § 692A.2A lacks the notice required by procedural due process, and the Court agrees. Procedural due process "insists that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Under § 692A.2A, the burden is placed on the offender to ensure that they are not living within a restricted area. Some, but not all jurisdictions have developed maps to aid sex offenders in procuring a residence. But, as Carroll County Attorney John Werden testified, these maps are not meant to be accurate; they are reasonable approximations to be used as a guide. As well, Werden brought to light the fact that the Act provides no guidance to the counties on how to implement or enforce the law. Depending on

where a county chooses to place the origins for its circles, in the center or at the edge of the property, an offender might live in violation of § 692A.2A under a particular county's interpretation of the Act, while in compliance in a county that employs a different standard of measurement.

Enforcement of the law appears quite varied amongst the several counties as well. In some counties, law enforcement works with the offender to try and find suitable housing, while in others, offenders are arrested for violating the residency restriction without any prior warning. Law enforcement officials and sex offenders alike testified that they were unsure of how to measure the distance and ended up trying to gauge two thousand feet with an automobile odometer. Taken together, a person of ordinary intelligence faces an extremely difficult challenge in trying to determine whether his or her conduct is violative of the Act. As § 692A.2A deprives offenders of a liberty interest with insufficient notice and no opportunity to be heard, the Court holds that the Act violates the procedural component of the Due Process Clause.

## D. Self Incrimination

■ In relevant part, the Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has long held:

> this prohibition not only permits a person to refuse to testify against himself at a criminal trial in which he is a defendant, but also 'privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'

*Minnesota v. Murphy,* 465 U.S. 420, 426, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973)).

Pursuant to Iowa Code § 692A.2, sex offenders are required to register their current address with the county sheriff. Failure to provide this information constitutes an aggravated misdemeanor for a first offense, and a class D felony for subsequent offenses. *See* Iowa Code § 692A.7. If a sex offender is living in violation of the two thousand foot residency restriction, completing the registration would mean admitting to a criminal act. Because the offender faces criminal charges regardless of whether he completes the registration, Plaintiffs argue that § 692A.2A violates their Fifth Amendment right against self incrimination.

Defendants attempt to align this case to *Pennsylvania v. Muniz,* 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), wherein the Supreme Court identified a "routine booking question" exception to *Miranda* that provides that the government can elicit biographical information without informing a suspect of his or her *Miranda* rights, even where the information later turns out to be incriminating. *See Muniz,* 496 U.S. at 589–97, 110 S.Ct. 2638. In that case, however, an impaired driver was videotaped while he was being booked. *Id.* at 590, 110 S.Ct. 2638. The videotape was later shown to the finder of fact who based its conclusion that Muniz was impaired on his demeanor and responses to the booking questions, not the answers to the questions themselves. *Id.* In reaching its conclusion, the Court noted that Muniz did not incriminate himself with the facts given as answers to the booking questions, but by his appearance and mannerisms in providing the answers. *Id.* at 593, 110 S.Ct. 2638. In stark contrast to *Muniz,* though, sex offenders who refuse to provide their cur-

rent address upon registering are subject to serious criminal charges and substantial jail time. As well, here it is precisely the fact attained by the offender's response that would incriminate him. His demeanor is irrelevant.

■ To be afforded protection under the Fifth Amendment, incriminating communications must be testimonial. *Id.* at 594, 110 S.Ct. 2638. "In order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information." *Doe v. United States,* 487 U.S. 201, 210, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988). Under the registration requirements of Iowa Code Chapter 692A, sex offenders living in violation of § 692A.2A must either provide information that explicitly admits the facts necessary to prove the criminal act or refuse to register and be similarly prosecuted. As such, the Court holds that Iowa Code § 692A.2A unconstitutionally requires sex offenders to provide incriminating evidence against themselves.

## E. Cruel and Unusual Punishment

■ Finally, Plaintiffs argue that § 692A.2A violates the Eighth Amendment's guarantee against cruel and unusual punishments, made applicable to the states by virtue of the Fourteenth Amendment's Incorporation Clause. A punishment will be found to be cruel and unusual either where it inflicts torture, or is otherwise barbaric, or where the punishment inflicted is so excessively severe that it is disproportionate to the offense charged. *Coker v. Georgia,* 433 U.S. 584, 591–92, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). Plaintiffs argue that the residency restriction's resemblance to the historical punishment of banishment evidences the barbaric nature of the punishment. Plaintiffs also argue that a lifelong residency restriction for sex offenders is excessive in relation to the crime. The Court disagrees.

Although the effect of § 692A.2A carries with it a strong resemblance to an order of banishment, the Act does not completely banish an individual. Moreover, the Court is not convinced that banishment is truly a barbaric punishment. The list of cases cited by Plaintiffs to show when certain states set aside banishment as a condition of probation would appear to undercut, rather than to assist, Plaintiffs' argument because in none of the cases did the reviewing courts ever completely reject banishment as a condition of probation. *See e.g. State v. Muhammad,* 309 Mont. 1, 43 P.3d 318, 323–24 (2002) (comparing decisions regarding banishment and holding that condition at issue went beyond what was necessary); *State v. Franklin,* 604 N.W.2d 79, 83 (Minn.2000) ("[g]eographical limitations may be imposed as a probation condition, but the condition must be reasonably related to the purposes of probation") (citations omitted). As the Supreme Court has noted, "[s]evere, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." *Harmelin v. Michigan,* 501 U.S. 957, 994–95, 111 S.Ct. 2680, 115 L.Ed.2d 836. The Court, therefore, finds that the residency restrictions are not unconstitutionally barbaric or tortuous.

Plaintiffs next contend that the residency requirement in § 692A.2A is disproportionate and, therefore, unconstitutional because the law makes no individual determination for whether a given offender is a danger to the community. Although this argument supports Plaintiffs' position in other claims, it must fail under Eighth Amendment Jurisprudence. The Supreme Court has identified an "individualized capital sentencing doctrine" whereby "a capital sentence is cruel and unusual under the Eighth Amendment if it is im-

posed without an individual determination that that punishment is 'appropriate'- whether or not the sentence is 'grossly disproportionate,'" *id.* at 995, 111 S.Ct. 2680 (citations omitted), but the Court has flatly refused to apply the doctrine to anything other than capital sentences. *See Id. See also Ewing v. California,* 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (finding California "three-strikes" law constitutional and not cruel and unusual). Plaintiffs may consider a two thousand foot residency restriction cruel or overly harsh, and many would agree. Considered in light of the Eighth Amendment, however, the Court finds that § 692A.2A is not a cruel and unusual punishment.

## III. ORDER

The Court finds that application of Iowa Code § 692A.2A on those Plaintiffs who committed their respective crimes prior to July 1, 2002 violates the Ex Post Facto Clause of the United States Constitution. The Court concludes that the Act unconstitutionally infringes upon Plaintiffs' Fourteenth Amendment rights to substantive and procedural due process. Furthermore, the Court finds that § 692A.2A unconstitutionally requires sex offenders living in violation of the law to provide incriminating testimony against themselves in violation of the Fifth Amendment. Lastly the Court finds that § 692A.2A does not violate the Eighth Amendment's guarantee against cruel and unusual punishments.

Having declared Iowa Code § 692A.2A unconstitutional, the Court hereby permanently enjoins Defendants from enforcing the Act.

IT IS SO ORDERED.